IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION
2:92cv239

| | |
|---|---|
| EASTERN BAND OF CHEROKEE INDIANS, )<br>)<br>Plaintiff, )<br>Vs. )<br>)<br>JAMES B. HUNT, Governor of the )<br>State of North Carolina; and )<br>THE STATE OF NORTH CAROLINA, )<br>)<br>Defendants. )<br>) | MEMORANDUM OF DECISION |

**THIS MATTER** is before the court on defendants' Motion to Dismiss. While also contending that plaintiff has failed to state a claim, defendants primarily argue that this court lacks jurisdiction over them because of sovereign immunity. Although the parties provided extensive briefs, oral arguments were ordered and heard June 10, 1993, in Asheville, North Carolina. At such hearing, plaintiff (the Tribe) was represented by Ben Oshel Bridges of the Jackson County Bar and defendants were represented by David F. Hoke, Assistant Attorney General for the State of North Carolina.

I. **Background**

For the limited purpose of defendants' Motion to Dismiss, plaintiff's factual contentions have been taken as true and are summarized here for purposes of aiding further review. Honorable Jonathan Taylor, Principal Chief of the Eastern Band of Cherokee Indians, corresponded with former Governor James G. Martin in May 1991 and asked him to initiate negotiations for a Class III gaming compact[1] between the State and the Tribe.

---

[1] While not relevant on the motion now before the court, Class III gaming includes high-stakes gambling.

The following month, Governor Martin responded to Chief Taylor's inquiry by way of letter, wherein he stated that he disapproved of gambling, that video gaming was illegal in North Carolina, and that negotiations were premature.

In January 1992, the Tribe submitted to then Attorney General Lacy H. Thornburg a proposed Class III gaming compact which would have authorized raffles and video gaming activities.[2] Attorney General Thornburg was asked by the Tribe to review the proposed compact and commence negotiations with the Tribe. In May 1992, Attorney General Thornburg responded to the Tribe with an opinion letter stating that if Governor Martin signed the compact it would be a legally binding agreement between the State and the Tribe.

Governor Martin's legal counsel[3] discussed the proposed compact with tribal representatives in June 1992; thereafter, Governor Martin requested and received additional information from the Tribe and legal opinions from Attorney General Thornburg. After personally reviewing the video gaming machines the Tribe proposed to use, Attorney General Thornburg wrote a letter to Governor Martin informing him that, in the opinion of the Attorney General, the games fell outside the prohibition of slot machines and were games requiring skill or dexterity on the part of the player.[4]

---

[2] Plaintiff describes these video gaming devices as merely electronic versions of already permitted Class II gaming activities such as bingo. Plaintiff's Brief, at 7. Because Congress has defined all video gaming devices as Class III games, plaintiff seeks to negotiate a compact with the State, reasoning that while slot machines are prohibited, "video games" involving a player's skill or dexterity are permitted under Chapter 14-306 of the North Carolina General Statutes.

[3] The governor's legal counsel is an executive staff member, not the Attorney General; however, at the hearing and throughout these proceedings the governors (past and present) have been appearing through the Attorney General.

[4] Since issuance of such opinion, a new Attorney General, Mike F. Easley, was elected and took office. Counsel for defendants stated at the hearing that Attorney General Thornburg was the only member of the contingent of attorneys reviewing the machines who found that any

2

Plaintiff contends that defendants have failed to deal in good faith with the Tribe in negotiating a gaming compact. In support of that contention, plaintiff alleges that for over a year Governor Martin refused to meet with tribal officials and prohibited his staff from responding to the compact proposed by the Tribe.[5] Defendants counter that they have negotiated in good faith and that plaintiff has failed to state a cause of action under the Indian Gaming Regulatory Act (IGRA)--25, United States Code, Sections 2701, et seq.

II. **Genesis of IGRA**

In California v. Cabazon Band of Indians, 480 U.S. 202 (1987), the Supreme Court held that California's attempt to prohibit bingo on tribal lands interfered with tribal self-governance. The Court further held that the state's interest in preventing permeation of organized crime was outweighed by the tribe's interest in economic development and self-sufficiency. Id., at 219-22. The Court's decision in California v. Cabazon Band of Indians triggered a national upsurge in tribal interest in gaming and created a comparable concern by state and local governments as to the impact of such gaming on the welfare of communities surrounding the Indian enclaves. Responding to such diverse concerns, Congress found that it had failed to enact "clear standards or regulations for the conduct of gaming on Indian lands," Section 2701(3), and, to remedy such malady, enacted IGRA.

---

skill or dexterity was involved in the games. Counsel for defendants informed the court that the only skill or dexterity required was in putting money into the machine.

[5] This action was commenced in December 1992, one month after the state's gubernatorial election, and one month before the inauguration of Governor James B. Hunt.

3

## III. Jurisdiction in this Court Over the State of North Carolina

### A. Eleventh Amendment Immunity of the States

While delineated in Article III of the United States Constitution, this court's jurisdiction to resolve certain matters involving any of the several states is limited by the eleventh amendment. Welch v. Dept. of Highways & Public Trans., 483 U.S. 468, 472 (1987). The eleventh amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign state.

Although "[t]he Eleventh Amendment bar to suit is not absolute," Port Auth. Trans-Hudson v. Feeney, 495 U.S. 299, 304 (1990); a state simply is not subject to suit in this court without its consent, Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1984). A state's consent may either be express or found in the "plan of convention."[6] Atacadero State Hospital v. Scanlon, 473 U.S. 234 (1985). This concept was succinctly explained in Blatchford v. Native Village of Noatak, ___ U.S. ___, 1991 U.S. LEXIS 3637 (1991), wherein the Court reasoned:

> [W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty, and that a State will therefore not be subject to suit in federal court unless it has consented to suit, either expressly or in the "plan of the convention."

---

[6] The "plan of convention" is the United States Constitution.

> States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been "a surrender of this immunity in the plan of the convention." The Federalist, No. 81.

Monaco v. Mississippi, 292 U.S. 313, 322-23 (1934).

4

Id., 1991 U.S. LEXIS, at 6-7 (citations omitted). Through the plan of convention, the several states waived their immunity from suit by sister states, South Dakota v. North Carolina, 192 U.S. 286, 318 (1904); and their immunity from suit by the United States, United States v. Texas, 143 U.S. 621 (1892).

### B. Express Waiver

The pleadings do not reveal and the plaintiff does not argue that the State of North Carolina has expressly waived its immunity from suit in this court. At the hearing, defendants did, however, admit that they had been negotiating a Class III gaming compact with the Tribe as contemplated by IGRA. *Ex moro motu*, the issue of implicit waiver was raised by the court. After reviewing relevant authority, it appears to the court that a state does not impliedly waive its immunity when it engages in negotiations for a Class III gaming compact under IGRA. Waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed.'" United States v. Testan, 424 U.S. 392, 399 (1976) (quoting United States v. King, 395 U.S. 1, 4 (1969)).[7] The State of North Carolina has clearly neither expressly nor impliedly waived its immunity from suit in this court.

### C. Waiver in the Plan of Convention

#### 1. Abrogation

While Congress may *attempt* to abrogate sovereign immunity in any legislation, Congress may *lawfully* abrogate the States' immunity only in the exercise of either its enforcement authority under Section 5 of the fourteenth amendment, Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976); or its powers under the Interstate Commerce Clause, Pennsylvania

---

[7] It is interesting to note that Indian tribes also enjoy many of the attributes of sovereignty, including "the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978).

5

v. Union Gas Co., 491 U.S. 1, 14-15 (1989). In Dellmuth v. Muth, 491 U.S. 223 (1989), the Supreme Court found, as follows:

> To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure, we have applied a simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.

Id., at 227-28. While federal district courts are divided as to whether IGRA is constitutional,[8] such courts have consistently found that Congress, in enacting IGRA, clearly attempted to abrogate the States' sovereign immunity as to suits by Indian tribes.

This court agrees and finds that the plain language of the statutory scheme manifests Congress's intent to allow suits in federal court by Indian tribes against the several states. Congress is both clear and specific in IGRA, plainly providing that states may be haled into federal court if they fail to deal in good faith in negotiating gaming compacts with tribal authorities.

### 2. Lawful Abrogation

In its plurality decision in Union Gas, supra, the Court held that the plain language of the Comprehensive Environmental Response, Compensation, and Liability Act (better known as "CERCLA") permits a suit for monetary damages against a state in federal court.

---

[8] The following published cases hold that IGRA *does not* violate the eleventh amendment: Kickapoo Tribe of Indians v. Kansas, ___ F.Supp. ___, 1993 U.S. Dist. LEXIS 4466 (D. Kan. 1993); Seminole Tribe of Florida v. Florida, 801 F.Supp. 655 (S.D. Fla 1992).

The following published cases hold that IGRA *does* violate the Constitution: Saul Ste. Marie Tribe of Chippewa Indians v. Michigan, 800 F.Supp. 1484 (W.D. Mich. 1992); Poarch Band of Creek Indians v. Alabama, 776 F.Supp. 550 (S.D. Ala. 1991); and Spokane Tribe of Indians v. Washington, 790 F.Supp. 1057 (E.D. Wash. 1991).

Id., at 5. A majority[9] of the Court determined that Congress could lawfully abrogate the States' sovereign immunity from suit in federal court when it promulgated legislation pursuant to the Interstate Commerce Clause of Article I, Section 8, Clause 3, of the United States Constitution. Id., at 13-23.[10] In his concurring opinion, Justice White reasoned "that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States . . . ." Id., at 57. Those district courts which have found IGRA to be a proper exercise of constitutional power have also found that the powers granted to Congress in Article I to regulate Indian affairs must be coextensive with the plenary authority granted under the Interstate Commerce Clause. See Seminole Tribe of Florida v. Florida, supra, at 661.[11] This court must disagree with the court in Seminole Tribe of Florida and concur with the reasoning of the court in Poarch Band of Creek Indians, supra:

> Because Union Gas is not directly on point, and with an eye toward the shaky ground on which it stands, this Court does not find the decision to be controlling. The weakness of the plurality opinion leads this Court to believe that it should not be given an expansive application and that, read narrowly, it does not require a determination that Congress had the power to abrogate Alabama's Eleventh Amendment immunity when it enacted the Indian Gaming Regulation Act.

---

[9] Because of the unusual nature of Justice White's concurring opinion, this majority is described by other courts as consisting of "four-and-a-half" votes. See Poarch Band of Creek Indians, supra, at 559.

[10] In his dissenting opinion in Union Gas, Justice Scalia expressed dissatisfaction with the idea that Article III powers could be circumscribed by Article I, and deduced that "instead of cleaning up the muddled Eleventh Amendment jurisprudence produced by Hans, the Court leaves that in place, and adds to the clutter the astounding principle that Article III limitations can be overcome by simply exercising Article I powers."

[11] The Seminole court held that "[s]ince Congress clearly possesses complete and plenary authority in the area of Indian affairs, which is at least as broad as Congress' interstate commerce power, we hold that Congress has the power to abrogate the States' immunity pursuant to the Indian Commerce Clause." Id., at 661 (footnote omitted).

> To begin with, Justice White's mysterious, laconic concurrence on the abrogation issue makes the plurality opinion something of a "four-and-a-half" vote majority. Moreover, two of the justices who joined the plurality opinion, Justice Marshall and Justice Brennan, are no longer members of the Supreme Court. While this fact does not in itself change the fact that the decision is presently on the books, Justice Scalia's four-vote dissent on the abrogation issue pointed out that the holding in Union Gas is "unstable" and the principle on which it rests "too much at war with itself to endure." 109 S. Ct. at 2273. Accordingly, this Court does not believe that the Union Gas decision should be given an expansive application until further guidance from the Supreme Court regarding exactly what the decision means and where it is leading.
>
> With this understanding of Union Gas, it is clear that applying it to this case would be an unwarrantably expansive application. While Union Gas involved Congress' power to abrogate a state's Eleventh Amendment immunity when legislating pursuant to the Interstate Commerce Clause, the attempted abrogation at issue here was enacted pursuant to Congress' power under the Indian Commerce Clause. As the Supreme Court declared during the same term it decided Union Gas, "It is well established that the Interstate Commerce and Indian Commerce Clauses have very different applications." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 104 L. Ed. 2d 209, 109 S. Ct. 1698, 1716 (1989). As the Court elaborated, "the extensive case law that has developed under the Interstate Commerce Clause is premised on a structural understanding of the unique role of the states in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." Id. This Court does not feel warranted in extending Union Gas's holding that Congress may abrogate a state's Eleventh Amendment immunity when legislating pursuant to the Interstate Commerce Clause to the Indian Commerce Clause.

Id., at 558-59.[12] In the plan of convention, the several states appear to have ceded certain rights they had as separate sovereigns before they joined the Union. Among such ceded rights, the States granted to the central government the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes. . . ." U.S. Const., Art. I, § 8, Cl. 3.

---

[12] Just as did the Poarch Band of Creek Indians court, this court has difficulty "imagin[ing] how the Indian Commerce Clause, a provision of Article I of the Constitution, could restrict the operation of the Eleventh Amendment, since the Eleventh Amendment was adopted subsequent to and for the purpose of amending the original Constitution." Id., at 559.

8

In <u>Saul Ste. Marie Tribe of Chippewa Indians v. Michigan</u>, <u>supra</u>, the district court found that "*Blatchford* holds that states did not waive immunity to suit by Indian tribes. . . . The Court therefore determines that it would be inappropriate to extend Union Gas to apply to the Indian Commerce Clause." <u>Id.</u>, at 1489-90. This court agrees with plaintiff that the <u>Blatchford</u> Court did not reach the issue of whether the Indian Commerce Clause waives the States' immunity from suit in federal court by Indian tribes. Even so, the reasoning of the <u>Blatchford</u> majority, while dictum, is highly persuasive:

> We have repeatedly held that Indian tribes enjoy immunity against suits by States, as it would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties. But if the convention could not surrender the tribes' immunity for the benefit of the States, we do not believe that it surrendered the States' immunity for the benefit of the tribes.

<u>Id.</u>, at 12. This court finds that this action against the State of North Carolina is barred by the eleventh amendment to the United States Constitution.


### IV. The Governor of the State of North Carolina

State governors enjoy the same eleventh-amendment immunity from suit in this court as do the several states. <u>Hafer v. Melo</u>, ___ U.S. ___, 112 S.Ct. 358 (1991). Indeed, a suit against the Governor acting in his official capacity is a suit "in fact against the sovereign if the decree would operate against the latter." <u>Hawaii v. Gordon</u>, 373 U.S. 57, 58 (1963). The reasoning discussed above would, therefore, apply equally to plaintiff's claim against the Governor. Operating as an exception to the eleventh amendment, the court may only

9

compel a state official to perform a ministerial duty he has neglected.[13] In Ex parte
Young, 209 U.S. 123 (1908), the Court held:

> [A federal court cannot] control the discretion of [a state] officer. It can only
> direct affirmative action where the officer having some duty to perform not
> involving discretion, but merely ministerial in its nature, refuses or neglects to
> take such action. In that case the court can direct the defendant to perform
> this merely ministerial duty.

Id., at 158. Finding that Governor Hunt enjoys eleventh-amendment immunity from suit in this court and that plaintiff does not seek to compel him to perform a neglected ministerial act, the Governor's Motion to Dismiss will be allowed.

## V. Other Grounds for Dismissal

Defendants have also alleged that plaintiff has not stated a claim, inasmuch as failure to negotiate is excused by the statute itself because Class III gaming of any sort is prohibited in North Carolina. Defendants also contend that this matter should be dismissed because they have, in fact, negotiated with the Tribe in good faith. Whether the State has engaged in negotiations is fact specific. Defendants' contention that all Class III gaming is prohibited in North Carolina is belied by their admission in their brief that the State does allow raffles, which are Class III gaming activities. Such motions to dismiss will, therefore, be denied

Finally, defendants contend that the tenth amendment is violated by IGRA because the statute requires states to regulate certain conduct. The reasoning of the district court in Yavapai-Prescott Indian Tribe v. Arizona, ___ F.Supp. ___, 19 I.L.R. 3126 (D. Ariz. 1992) is persuasive:

---

[13] Plaintiff would have this court compel Governor Hunt to engage in "good-faith" negotiations with the Tribe. Negotiations, by their very character, do not lend themselves well to characterization as "ministerial acts."

10

> If IGRA attempted to force the state to regulate by compact all gaming
> activities on tribal lands it might indeed run afoul of the tenth amendment.
> But Congress clearly was cognizant of the tenth amendment when it
> acknowledged that a state need not forego any state governmental rights to
> engage in or regulate class III gaming except whatever it may voluntarily cede
> to a tribe under a compact.

Id., 19 I.L.R., at 3129. The problem with IGRA is not that it compels states to regulate gaming on tribal lands, but that it would use federal courts to force the States to the bargaining table. Read without the provisions which offend the eleventh amendment, IGRA merely encourages states, which have perhaps the greatest to win and to lose if Class III gaming is allowed at Indian enclaves, to participate in the regulation of such activities. Through IGRA, Congress is merely ceding to the States some of Congress's exclusive authority over Indian affairs under Article I. If a state does not accept such assignment of rights, the duty merely falls back to the federal government through the Secretary of the Interior to formulate a plan for allowing Class III gaming consistent with gaming allowed by the host state. Consequently, defendants' Motion to Dismiss based on the tenth amendment will be denied.

VI.   **Conclusion**

In accordance with Rule 12(b)(1), Federal Rules of Civil Procedure,[14] and for the reasons discussed herein, this court must grant defendants' Motion to Dismiss the complaint as to all named defendants based on the procedural bar of the eleventh amendment.

---

[14] In their Motion to Dismiss, defendants do not cite Rule 12(b)(1), but merely list all their reasons for dismissal under Rule 12(b)(6).

11

Asserted under Rule 12(b)(6), defendants' other grounds for relief will be denied. Such determinations are reflected in a Judgment filed simultaneously herewith.

This __16th__ day of June, 1993.

_____
J. TOLIVER DAVIS
UNITED STATES MAGISTRATE JUDGE

Case 2:92-cv-00239-JTD    Document 15    Filed 06/16/93    Page 12 of 12